UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| BARBARA ANN SVOBODA, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> NANCY A. BERRYHILL, ) <br> Deputy Commissioner of Operations, ) <br> Social Security Administration, ) <br> ) <br> Defendant. ) | Case No. 4:17 CV 2437 (JMB) |

## **MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

### **I. Procedural History**

On June 3, 2014, plaintiff Barbara Ann Svoboda filed an application for a period of disability and disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of October 18, 2013. (Tr. 291-92). After plaintiff's application for benefits was denied on initial consideration (Tr. 235-38), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 241-42).

Plaintiff and counsel appeared for a hearing on March 17, 2016. (Tr. 195-226). Plaintiff and her husband testified concerning her disability, daily activities, functional limitations, and past work. The ALJ also received testimony from vocational expert Theresa Wolford, M.S. The ALJ issued a decision denying plaintiff's application on August 30, 2016. (Tr. 120-29). After receiving additional evidence submitted by plaintiff, the Appeals Council denied her request for

review on August 16, 2017. (Tr. 106-12). Accordingly, the ALJ's decision stands as the Deputy Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability and Function Reports and Hearing Testimony

Plaintiff was born on August 8, 1953, and was 60 years old on the alleged onset date. (Tr. 300). She lived with her husband in a condominium. (Tr. 313). She completed high school and cosmetology school. She worked as a hairstylist for 42 years until October 2013, when she had surgery to remove a benign tumor from her right foot. (Tr. 200-01); see also Cert. Earn. Rec. (Tr. 294-95). Plaintiff listed her impairments as poor circulation and cellulitis in her right leg, pain in her right knee, surgery to remove a tumor in right foot, varicose veins with pooling and swelling, blood clots, high cholesterol, high blood pressure, and chronic kidney failure. (Tr. 304). She was prescribed medications for the treatment of high blood pressure, high cholesterol, depression, and allergies; she also took low-dose aspirin. (Tr. 307, 358).

Plaintiff stated in her June 2014 function report (Tr. 313-23) that she was unable to stand on her foot and right leg and that she elevated her legs during the day. Her daily activities included making the bed, unloading the dishwasher, using the computer, making phone calls, resting or napping, and watching television. She occasionally prepared dinner and cleaned the kitchen, but took rest breaks. Her ability to do housework was limited by fatigue and so her husband did most of the laundry and a friend cleaned her house, leaving plaintiff to handle occasional picking up. She stated that she had difficulty sleeping because her legs "jump[ed] at night." (Tr. 314). Her conditions did not impair her ability to attend to her grooming or personal hygiene and she was able to drive and go out on her own. Plaintiff was able to walk for one block before she needed to rest for 10 minutes. She did grocery shopping once a week,

spending 30 to 45 minutes on the task. She was capable of managing her finances and had no impairment in her ability to concentrate and follow instructions. Her hobbies included watching television, reading magazines, and talking on the phone. She used to be able to go shopping, walk in parks, go on weekend outings, and entertain. She got along well with others but found it harder to handle stress as she got older. Plaintiff had difficulties with lifting, squatting, standing, walking, sitting, and kneeling. The Field Office interviewer described plaintiff as cooperative and without observable limitations. (Tr. 301).

Plaintiff testified at the March 2016 hearing that she had a painful lump removed from between the bones at the top of her right foot in October 2013. Following the surgery, she was unable to stand on the foot due to pain and decided that she could not return to hairdressing. She had pain up to mid-calf and tenderness in the arch of her foot. (Tr. 203-04). In addition, she had a long history of osteoarthritis in the right ankle. She had worked with the pain, using support hose and resting when she could, but the pain worsened over time. (Tr. 206). Plaintiff also testified that she had chronic kidney failure. When she learned that she had this condition, she gave up drinking soda and stopped taking all pain medication, including Tylenol. (Tr. 205-06). Finally, plaintiff had pooling blood and varicose veins in her leg. She had worn compression stockings when she was working, but still experienced pain. (Tr. 207, 212). She went to a vascular doctor in the 1990s but was told that her veins were too bad for treatment. (Tr. 208-09). She also was susceptible to cellulitis. (Tr. 209). These conditions had improved once she stopped working and was able to keep her foot above her heart, but after 45 minutes of standing, the blood pooled in her leg again. (Tr. 210-11). At the request of plaintiff's counsel, the ALJ agreed to order a consultative examination to address plaintiff's vascular problems. (Tr. 223).

Plaintiff's husband Daniel G. Svoboda testified that he and the plaintiff had been married for 19 years. (Tr. 218). He testified that, when she was working, her leg was "beet red and hurting her like crazy" when she got home. She would spend the evening with her foot elevated. (Tr. 219). Presently, she spent about half the day in that position. The ALJ clarified that Mr. Svoboda worked during the day and so was only able to observe his wife once he got home. (Tr. 220).

Vocational expert Theresa Wolford was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was able to perform light work, who could lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently, who could sit for six hours in an eight-hour day, stand or walk for six hours in an eight-hour day, who could occasionally climb ramps and stairs, and could frequently balance, stoop, kneel, crouch and crawl. (Tr. 222). According to Ms. Wolford, such an individual would be able to perform plaintiff's past work as a hairdresser. If the same individual were limited to sedentary work with all other limitations remaining the same, that individual would not have any transferable skills from her past work. (Tr. 222-23).

**B.  Medical Evidence**

1.  Treatment records

At an annual physical in February 2013, primary care physician Amita Bhalla, M.D., listed plaintiff's chronic conditions as hyperlipidemia, anxiety, benign hypertension, varicose veins,[1] scoliosis, impaired fasting glucose, and a history of colon polyps. (Tr. 407-12). Her medical history included surgical repair of a hernia, paroxysmal supraventricular tachycardia,

---

[1] Varicose veins are dilated branches of the great saphenous vein and small saphenous vein. Risk factors include family history, age, and pregnancy; a possible risk factor is standing for a long period of time. F. Line, et al., The Management of Varicose Veins, 100 Int. Surg. 158 (2015). https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4301287/ (last visited June 7, 2018).

and kidney disease. (Tr. 409, 387). Dr. Bhalla described plaintiff as having a sedentary lifestyle. On examination, she had moderately severe variscosities in both legs without indication of deep vein thrombosis. Her Body Mass Index (BMI) was 32.14, placing her in the obese category. Dr. Bhalla prescribed medication for treatment of high blood pressure, high cholesterol, allergies, and anxiety. An EKG showed no abnormal findings. (Tr. 410).

In September 2013, plaintiff consulted Andrew M. Rouse, M.D., regarding a lump on the top of her right foot, which was gradually getting bigger and was painful with shoe pressure and activity. (Tr. 440-41). She rated the pain at level 8 on a 10-point scale. An MRI established that plaintiff had a lipoma, measuring 2.6 cm by 2.7 cm by 9 cm, that abutted tendons and muscles in the foot. (Tr. 443-44). The MRI also disclosed subchondral cysts and marrow edema, likely related to mild osteoarthritis. On October 22, 2013, Dr. Rouse excised the lipoma. (Tr. 442). Two weeks later, Dr. Rouse described the incision as healing well and set November 21, 2013, as a tentative return-to-work date. (Tr. 427, 438). Plaintiff later asked to postpone her return to work, noting that she had pain in her feet after being up for a short period of time. (Tr. 429-30). On November 15, 2013, plaintiff reported that she felt a "pop" in the foot and had burning over the incision. (Tr. 431). On December 2, 2013, plaintiff reported that her foot kept swelling and was tender to the touch, and she found it too painful to wear shoes or compression socks. Dr. Rouse authorized her to remain off work indefinitely. (Tr. 432).

Dr. Bhalla's findings at plaintiff's next annual physical in March 2014 did not differ significantly from the 2013 findings. (Tr. 384-96). As relevant here, Dr. Bhalla described plaintiff's varicose veins as asymptomatic and noted that she had spider veins in both legs, more so on the right side. On examination, plaintiff had a normal gait, strength and tone, and her extremities appeared normal without edema. Her Body Mass Index (BMI) was 33.13. Plaintiff

5

continued to take medications for the treatment of high blood pressure, high cholesterol, allergies, and anxiety. Dr. Bhalla instructed plaintiff to follow a low cholesterol diet, avoid simple carbohydrates, and exercise regularly. (Tr. 385-86).

In June 2014, plaintiff returned to see Dr. Rouse with complaints of pain in her right foot and ankle, which worsened when she was on her feet. (Tr. 436-37). She had a lot of trouble going down steps and was worried she would lose her balance. Examination revealed tenderness in the dorsal midfoot. After reviewing x-rays, Dr. Rouse concluded that plaintiff's symptoms were consistent with early arthritis in the midfoot. He prescribed a support for her midfoot and instructed her on modifying her activities and using ice and anti-inflammatories.

In July 2014, Dr. Bhalla noted that plaintiff was compliant with medications and diet, but was not exercising as prescribed. She denied experiencing myalgias or leg pain at that time. (Tr. 451-52). In September 2014, plaintiff continued to be noncompliant with exercise recommendations. On examination, she had intact pedal pulses and exhibited no edema. (Tr. 452-53). The same was noted in January 2015. (Tr. 454-55). At her annual physical in May 2015, however, plaintiff reported that she had started exercising and had lost two pounds. (Tr. 456-58). The findings on examination were unchanged from the prior year.

At follow-up with Dr. Rouse in August 2015, plaintiff continued to complain of pain in her foot that was worse with activities that involved the ball of her foot, such as going up and down stairs. (Tr. 469-70). The pain was severe enough "that her foot wants to give out." She had no pain when she stayed off her feet. Examination showed normal alignment of the foot and ankle, with symmetrical motion. Plaintiff had good pedal pulses and intact sensation, with some tenderness. X-rays again showed arthritic changes in plaintiff's right foot and ankle. Dr. Rouse

recommended that she modify her activities and her shoes, and use ice, anti-inflammatories, and an insert designed to take stress of the affected region.

In September 2015, plaintiff sought treatment from Andrew C. Spitzfadden, M.D., for evaluation of pain in her right hip that started while she was exercising. (Tr. 471-72). She reported that she was not taking any pain medication due to kidney disease. On examination, Dr. Spitzfadden noted that plaintiff did not have lymphedema, clubbing or cyanosis, and displayed smooth range of motion, with mild pain suggestive of bursitis. X-rays showed mild degenerative joint disease. She was diagnosed with right hip pain with possible trochanteric bursitis. At Dr. Spitzfadden's recommendation, plaintiff completed six sessions of physical therapy. (Tr. 487-500). On October 20, 2015, plaintiff reported to Dr. Spitzfadden that she felt much better and was very pleased with her outcome. He recommended that she continue with her home exercises. (Tr. 473-74).

On April 22, 2016, approximately three weeks after the hearing before the ALJ, plaintiff saw vascular specialist Vito A. Mantese, M.D., for complaints of swelling and pain in her right leg and increasing varicose veins. (Tr. 508-20). Plaintiff reported that the varicose veins in her right leg were more severe and painful, but improved with elevation. She could not tolerate support stockings and the pain made it hard for her work. She also reported that she had several prior episodes of phlebitis and DVT. (Tr. 512). In conducting a review of systems, Dr. Mantese noted that plaintiff had fever, hypertension, leg swelling, trouble walking, and anxiety. (Tr. 514-15). On examination, plaintiff was not in acute distress. She had swelling in the extremities and varicose veins in the right leg, but no deformity, weakness, clubbing, or cyanosis. Her pedal pulses were intact and she had no sensory deficits. (Tr. 515-16). A venous reflux study showed deep venous incompetency in plaintiff's right leg. (Tr. 525). Plaintiff was diagnosed with

postphlebitic syndrome and instructed to wear support stockings.[2]  (Tr. 517, 511).  At follow-up on May 4, 2016, Dr. Mantese found that plaintiff had incompetent greater saphenous veins bilaterally and deep venous incompetency of the right femoral vein.  Among the treatment options he discussed with plaintiff was endovenous laser therapy (EVLT).  (Tr. 530).  On May 11, 2016, Dr. Mantese reviewed the results of a CT venogram which confirmed deep and superficial incompetency in the right leg but showed no proximal obstructions.  Dr. Mantese concluded that EVLT might worsen plaintiff's condition.  He recommended that plaintiff exercise and use support stockings.  He also directed her to consult with Dr. David German, M.D., of the Mercy Hyperbaric and Wound Treatment Center, for assessment of lymphedema. (Tr. 538, 534, 558).

On May 12, 2016, Deborah Westbrook, RN, of Dr. German's office made an entry in plaintiff's medical record.[3]  (Tr. 558).  Plaintiff reported that her leg edema started when she was around 24 years old.  Dr. German encouraged plaintiff to elevate her legs as much as possible,

---

[2] "Chronic venous insufficiency is impaired venous return, sometimes causing lower extremity discomfort, edema, and skin changes.  Postphlebitic (postthrombotic) syndrome is symptomatic chronic venous insufficiency after deep venous thrombosis (DVT).  Causes of chronic venous insufficiency are disorders that result in venous hypertension, usually through venous damage or incompetence of venous valves, as occurs (for example) after DVT.  Diagnosis is by history, physical examination, and duplex ultrasonography.  Treatment is compression, wound care, and, rarely, surgery.  Prevention requires adequate treatment of DVT and compression stockings."  J.D. Douketis, <u>Chronic Venous Insufficiency and Postphlebitic Syndrome</u>, Merck Manual, https://www.merckmanuals.com/professional/cardiovascular-disorders/peripheral-venous-disorders/chronic-venous-insufficiency-and-postphlebitic-syndrome (last visited on June 7, 2018).

[3] The note says in relevant part:

> This patient arrived for us to assess bilateral leg edema, with varicose veins in the lower extremity extending up the inner thigh on the right. . . .  Dr. German was in to see this patient — new orders received.  This patient was encouraged to elevate her legs as much as possible, monitor sodium intake, keep skin moisturized, wear double layer tubigrip size F in both legs[,] apply in the am and remove at bedtime.  The patient . . . will follow up in one month for possible lymphedema pump evaluation.

8

monitor her sodium intake, and wear Tubigrip on both legs during the day. In addition, she was to be evaluated for use of a lymphedema pump.

2. Opinion evidence

On December 20, 2013, State agency physician Fredric Simonwitz, M.D., completed a review of the medical evidence and opined that plaintiff's alleged conditions were not disabling. (Tr. 230-32). Dr. Simonwitz reported that plaintiff's allegation of kidney failure was not supported in the medical evidence of record by clinical or laboratory findings. Her elevated blood pressure was controlled with medication and there was no evidence of hypertensive crises or end-organ manifestations. While the medical records documented her elevated cholesterol, the condition in and of itself is not disabling. There was no evidence in the record to support her claims of blood clots, right knee pain, poor circulation in legs or cellulitis. With respect to her claim of pain in the right foot, she had a lipoma removed and x-rays disclosed mild osteoarthritis. Plaintiff had no impairment in her ability to manage dressing, grooming or personal hygiene. She was able to cook, drive, shop and complete light housework. Dr. Simonwitz determined that plaintiff did not have a medically determinable impairment for the purposes of work and that her allegations were only partially credible in that her list of alleged impairments seemed "hyperbolic," her responses in the function report seemed overstated, and her allegations were disproportionate to the facts in the medical record. (Tr. 230). Dr. Simonwitz listed plaintiff's medically determinable impairments as osteoarthritis and allied disorders, essential hypertension, hyperlipidemia, and varicose veins of the lower extremities. Dr. Simonwitz opined that all these impairments were non-severe. The ALJ agreed that plaintiff's impairments were non-severe if "viewed singularly," but were severe in combination. (Tr. 128).

9

On April 11, 2016, treating physician Dr. Bhalla completed a Medical Source Statement. (Tr. 505-06). Dr. Bhalla listed plaintiff's diagnoses as hypertension, hyperlipidemia, impaired fasting blood sugar, scoliosis, and right trochanteric bursitis. Her symptoms included fatigue, unstable walking at times, impaired sleep, pain, and swelling in the right leg. Dr. Bhalla opined that plaintiff was unable to sit, stand or walk as much as two hours in an eight-hour work day. In addition, she would need to walk around, shift positions from sitting to standing at will, and take half-hour breaks every two hours. In addition, plaintiff should elevate her legs during periods of prolonged sitting. Dr. Bhalla opined that plaintiff had the ability to lift and carry up to 10 pounds frequently and up to 20 pounds rarely, could frequently twist, stoop or bend, occasionally climb stairs, rarely crouch, and never climb ladders. She had no limitations on her abilities to reach and manipulate. Emotional factors contributed to the severity of plaintiff's symptoms and functional limitations and anxiety affected her pain. Pain would seldom impair her ability to pay attention and concentrate and she would never require redirection during a work day. She was moderately limited in her ability to deal with stress. In a narrative section, Dr. Bhalla wrote that plaintiff would have difficulty working a full-time job on a sustained basis because "she states she does not have the stamina to do full-time work [and she] complains of pain in right leg, right foot, and right hip." In support of this assessment, Dr. Bhalla cited plaintiff's recent diagnosis with right trochanteric bursitis. The ALJ gave this opinion "very little to no weight." (Tr. 128).

Melvin J. Butler, M.D., completed a consultative examination in April 2016. (Tr. 543-44, 553-56). Plaintiff complained of intermittent pain in her right knee and hip after standing more than four hours without a break or walking more than one or two blocks. (Tr. 554). Dr. Butler observed that plaintiff was not in apparent distress and had no difficult ambulating, transitioning from sitting to standing, or getting on and off the examination table. On

examination she had full range of motion and good strength. Her right knee showed positive crepitus with movement. Her pedal pulses were intact. She had some varicose veins in her legs which Dr. Butler described as nontender and nonpulsating. Dr. Butler assessed plaintiff with osteoarthritis of the right hip and knee, varicose veins, hypertension, and hyperlipidemia. He opined that she was able to work. (Tr. 555-56).

Following the examination, Dr. Butler completed a medical source statement, in which he opined that plaintiff had the ability to lift or carry up to 20 pounds frequently; and up to 50 pounds occasionally. (Tr. 546-52). She was able to sit up to 6 hours without interruption, and stand or walk for 2 hours without interruption and up to 2 hours total in an 8-hour day. Dr. Butler found that plaintiff was able to use her hands to reach, handle, finger and feel frequently, and to push or pull occasionally. She also could use foot controls frequently. She could occasionally climb ladders or scaffolds, crouch or crawl, and frequently engage climb stairs and ramps, balance, stoop or kneel. She should avoid exposure to vibrations, pulmonary irritants and extreme temperatures but could frequently operate a motor vehicle and be around moving mechanical parts. She could tolerate occasional exposure to unprotected heights and humidity. Finally, Dr. Butler found that plaintiff was able to perform a full range of activities of daily living, such as shopping and meal preparation. (Tr. 837-42). The ALJ described Dr. Butler's opinion as "wildly inconsistent" with his examination notes and gave it little weight. (Tr. 125, 128).

        3.       <u>Evidence Submitted to the Appeals Council</u>

On November 8, 2016, plaintiff submitted medical records dated from February 8, 2016, through June 8, 2016, to the Appeals Council. (Tr. 135-94). As relevant to the issues here, on June 8, 2016, plaintiff told Dr. German that she felt well and was watching her sodium intake,

elevating her legs, and wearing Tubigrip. Dr. German noted that plaintiff had been evaluated for a lymphedema pump and was "[w]aiting on approval." (Tr. 137). He gave plaintiff a diagnosis of lymphedema tarda[4] bilateral lower extremities, moderate — improved. (Tr. 136). Dr. German directed plaintiff to wear 30-40 mmHg compression stockings during the day, elevate her legs as needed, use Tubigrip, and start using a lymphedema pump once approved by her insurance company. (Tr. 141-42). She was also instructed to exercise and lose weight. The Appeals Council found that "this evidence does not show a reasonable probability that it would change the outcome of the decision." (Tr. 107).

On October 3, 2016, plaintiff notified her attorney that she was using the "leg pump . . . 2 x daily each leg for 1 hour per leg." (Tr. 369). This information was submitted to the Appeals Council on October 4, 2016. (Tr. 367-69). There is no indication that the Appeals Council considered this information.

On June 23, 2017, plaintiff submitted medical records dated from September 16, 2016, through May 24, 2017. (Tr. 2-105). On May 24, 2017, Dr. Bhalla noted that plaintiff was using compression stockings and Tubigrips. Dr. Bhalla also stated "Lymphedema pump 6 hours on both legs." (Tr. 43). Because the ALJ decided plaintiff's case through August 30, 2016, the Appeals Council determined that this evidence did not relate to the period at issue. (Tr. 107).

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the

---

[4] "Lymphedema tarda is a congenital disease characterized by underdevelopment of lymphatic pathways. It manifests commonly after the third decade as accumulation of lymph in the interstitial spaces of the skin." A. Ibrahim, Primary Lymphedema Tarda, Pan 19 African Med. J 16 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4286225/ (last viewed on June 6, 2018).

"inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th

Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the

14

reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. The ALJ's Decision

The ALJ's decision in this matter addressed steps one through four, as outlined above. The ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2018, and had not engaged in substantial gainful activity since October 18, 2013, the alleged onset date. (Tr. 122). At steps two and three, the ALJ found that plaintiff had the following severe combination of impairments: obesity, early osteoarthritis of the midfoot, mild degenerative joint disease of the hip and right knee, and varicose veins/venous insufficiency. Id. The ALJ found that plaintiff's "individual conditions are slight abnormalities with no more than a minimal effect" on plaintiff's ability to perform basic activities but, in combination, caused more than minimal limitations. (Tr. 125).

The ALJ next determined that plaintiff had the RFC to perform a range of light work in that she was able to lift, carry, push or pull 20 pounds occasionally and 10 pounds frequently, sit for six hours in an eight-hour workday, never climb ropes, ladders or scaffolds, occasionally climb stairs and ramps, and frequently balance, stoop, kneel, crouch, and crawl. Id. In assessing plaintiff's RFC, the ALJ summarized the medical record and opinion evidence, as well as plaintiff's own statements regarding her abilities, conditions, and activities of daily living. While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ also determined that plaintiff's statements regarding

15

their intensity, persistence and limiting effect were "not entirely consistent with" the medical and other evidence. (Tr. 127). In making her credibility determination the ALJ found that plaintiff was "quite active," with "pretty much normal" daily activities. Id. In addition, the objective medical evidence showed only mild symptoms and no "doctor credibly stated that [plaintiff] was disabled or that she could not work." (Tr. 127).

At step four, the ALJ concluded that plaintiff could return to her past relevant work as a hair stylist. Id. Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act, through August 30, 2016, the date of the decision. Id.

## V. Discussion

Plaintiff argues that, as the result of factual errors and improper assessment of opinion evidence, the ALJ incorrectly found that she retained the RFC to perform light work,[5] rather than sedentary work. Plaintiff further argues that, if she is limited to sedentary work, she meets the requirements for disability under the medical-vocational guidelines. The Court finds that this matter must be remanded, although on a different basis than what plaintiff argues here.

Plaintiff asserts that the ALJ improperly rejected her allegation that she needs to elevate her legs for extended periods of time. During the period under review, plaintiff 's primary care physician frequently, but not always, described plaintiff's varicose veins as asymptomatic and, at the hearing in March 2016, the ALJ expressed concern that the record did not reflect that

---

[5] The Social Security regulations state:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

plaintiff ever sought treatment for this condition. (Tr. 207-08). In response, plaintiff testified that she had ignored the condition when she first started having symptoms because she was a single parent and needed to work. In the 1990s, when her husband convinced her to see a doctor, she was told that her veins were too bad for any treatment. (Tr. 208). So, plaintiff testified, she "babied" her legs and feet as much as she could. Even so, she had episodes of cellulitis. (Tr. 209-10). After she stopped working, she was able to keep her legs elevated and her veins improved. (Tr. 211). Her husband testified that she elevated her feet throughout the day.

Medical evidence supports plaintiff's allegation that she needed to elevate her legs and feet. In April 2016, vascular specialist Dr. Mantese noted that plaintiff had swelling in her legs. In addressing this evidence, the ALJ stated that Dr. Mantese found that plaintiff's varicose veins were asymptomatic. (Tr. 124, 127). This is incorrect: the record cited by the ALJ is actually a notation in a problem list that was entered in September 2011 and updated in 2013. (Tr. 536). Far from stating that plaintiff was asymptomatic, Dr. Mantese diagnosed plaintiff with incompetent greater saphenous veins bilaterally and deep venous incompetency of the right femoral vein in May 2016. He then referred plaintiff to Dr. German, who told her to elevate her legs as much as possible. The ALJ rejected Dr. German's evidence, in part because the note was recorded by Dr. German's nurse and, under the applicable regulations, nurses are not acceptable medical sources. The Court is not aware of any rule that diminishes the weight of a physician's assessment merely because it is recorded by a nurse on the physician's staff. The ALJ also objected that the instruction to plaintiff to elevate her legs "as much as possible" was insufficiently quantified. While more specificity might have been useful, the instruction as given was evidence that the ALJ should have taken into account in determining plaintiff's RFC.

17

Plaintiff also cites the June 8, 2016 medical records from Dr. German, in which he diagnosed her with lymphedema and directed her to start using a lymphedema pump. These records were first submitted to the Appeals Council, which decided not to consider and exhibit them because they did not show a reasonable probability that they would change the outcome.[6] "Under [20 C.F.R. § 404.970(b)], if a claimant files additional medical evidence with a request for review prior to the date of the [Commissioner's] final decision, the Appeals Council MUST consider the additional evidence if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Whitney v. Astrue, 668 F.3d 1004, 1006 (8th Cir. 2012) (emphasis in original) (quoting Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990)). "When additional evidence is submitted to the Appeals Council in an attempt to obtain review of an ALJ's decision, and the Appeals Council denies review with an express finding that the additional evidence is not new or material, a reviewing court has jurisdiction to determine whether the Appeals Council erred in determining that the evidence was not 'new' or 'material' within the meaning of 20 C.F.R. 404.970(b)." Goodwin v. Astrue, 549 F. Supp. 2d 1125, 1128-29 (D. Neb. 2008) (emphasis in original) (citing Williams, 905 F.2d at 215-16). Whether evidence is actually new, material, and related to the adjudicated period is a question of law the court reviews de novo. Box v. Shalala, 52 F.3d 168, 171 (8th Cir. 1995). The Appeals Council's failure to consider new evidence "may be a basis for remand by a reviewing court." Id.; see also Boyd v. Astrue, No. 4:08CV02705JLHBD, 2009 WL 856699, at *4 (E.D. Ark. Mar. 30, 2009) (holding that remand pursuant to sentence four is appropriate where Appeals Council erred by not evaluating new evidence as required by regulations).

---

[6] The Appeals Council also rejected for the same reason medical records from Dr. Bhalla from February 18, 2016 through May 24, 2016. (Tr. 143-94). The Court agrees that these records were not reasonably likely to change the outcome.

"To be material, new evidence must be non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Secretary's determination." Christofferson v. Berryhill, No. CV 16-5070-JLV, 2018 WL 1175414, at *4 (D.S.D. Mar. 6, 2018) (quoting Woolf v. Shalala, 3 F.3d 1210, 1215 (8th Cir. 1993)). The "additional evidence must not merely detail after-acquired conditions or post-decision deterioration of a pre-existing condition." Id. (quoting Bergmann v. Apfel, 207 F.3d 1065, 1069-70 (8th Cir. 2000)).

On June 8, 2016, Dr. German diagnosed plaintiff with lymphedema tarda. (Tr. 136). He instructed her to use compression stockings and Tubigrips and directed her to start using a lymphedema pump once her insurance company authorized it. (Tr. 141). This evidence should have been considered by the Appeals Council. First, it relates to the period before the ALJ's decision on August 25, 2016.[7] In addition, plaintiff's diagnosis and treatment plan for lymphedema were new and noncumulative. The evidence was also material in that it was both relevant to and probative of her allegation that she was unable to stand for extended periods of time. Finally, the ALJ repeatedly expressed concern that plaintiff had not sought treatment for her veins. (Tr. 207, 208, 209, 210, 211). Thus, there is a reasonably likelihood that Dr. German's conclusion that plaintiff required a lymphedema pump would have changed the ALJ's determination, in that it detracts from the ALJ's determination that plaintiff had the RFC to perform light work. The Court finds that the Appeals Council incorrectly decided not to consider and exhibit the June 8, 2016, treatment notes, and this matter will be remanded for further proceedings.

---

[7] Defendant mistakenly states that these records reflect treatment occurring after the ALJ's decision on August 25, 2016. [Doc. # 17 at 6].

Plaintiff also challenges the ALJ's decision to discount the opinion of Dr. Bhalla, her treating physician, and Dr. Butler, the consultative examiner. On remand, the ALJ should conduct a new analysis of the these opinions, in light of plaintiff's diagnosis with lymphedema and her use of a lymphedema pump. Plaintiff's assertion that she meets the requirements for disability under the medical-vocational guidelines can be addressed if it is determined that she retains the RFC to perform work at no more than the sedentary level.

\* \* \* \* \*

For the foregoing reasons, the Court finds that the Appeals Council's decision not to admit the June 8, 2016, medical records was incorrect.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 19th day of June, 2018.